**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

THOMAS CLARK,

        Plaintiff,

        v.                        CAUSE NO.: 1:18-cv-387-HAB

DEKALB COUNTY SHERIFF, DEPUTY
T. OLINSKE, DEPUTY T. McCORMICK,
and DEPUTY T.A. WAIDELICH,

        Defendants.

**OPINION AND ORDER**

In late 2016, a trailer was reported stolen from a jobsite in DeKalb County, Indiana, and local law enforcement began an investigation. By April 2018, officers had gathered enough evidence to obtain a search warrant for the property where they suspected stolen trailers were being kept. The Defendants are the law enforcement officers who interacted with Plaintiff Thomas Clark (Clark) during the execution of that search warrant. Clark alleges that Defendants falsely arrested and imprisoned him, retaliated against him when he exercised his right to remain silent, unlawfully searched his vehicle, and battered him and used excessive force by placing him in handcuffs too tightly and for an extended time.

Pending before the Court are Defendants' Motion for Summary Judgment (ECF No. 32), Plaintiff's Motion to Strike (ECF No. 42), and Defendants' Motion to Strike (ECF No. 48). These motions are fully briefed and ripe for consideration.

**STATEMENT OF FACTS**

As part of his investigation to recover a stolen trailer, Dekalb County Sheriff Deputy Thomas Olinske obtained a search warrant for property and outbuildings where Pat Longsworth

(Longsworth) lived with his mother, Doris. Officers, including Deputy Olinske, Sergeant McCormick, and Deputy Waidelich arrived at the property on April 3, 2018. Longsworth and Doris were present. A third person was also on the premises but was arrested and transported to jail when officers learned he had an active arrest warrant.

After some searching, officers discovered that a trailer was missing from an outbuilding. Longsworth stated he had sold it the day before. Deputy Olinske found a different trailer under a tarp. The vehicle identifiers had been sheared off or removed. Longsworth was then arrested for altering a VIN on a trailer and the trailer was impounded and towed.

After Longsworth's arrest, Deputy Olinske continued to ask Doris questions about the trailer sale. He also inquired about Thomas Clark, as Clark's name had surfaced during the investigation. Doris offered that Clark had been living on the property with his girlfriend, and that Doris believed Clark may have removed the VIN from the trailer.

As Deputy Olinske was talking to Doris, Clark drove onto the property in a semi-tractor and trailer he had used for work that day. Clark noticed the police vehicle and saw Sergeant McCormick and Deputy Olinske approaching his semi. Clark was out of the cab before they reached him. From here, the parties' version of the facts diverge greatly. Sergeant McCormick and Deputy Olinske claim Clark became very animated and agitated about the officers' presence. They assert he cursed, told them to leave, and threatened to leave himself.

For his part, Clark provides more details but denies that he behaved aggressively toward the officers, verbally resisted them or attempted to flee. He states that Deputy Olinske approached him by shining a flashlight directly into his face and asked for his name. The other two deputies then approached and Clark, responding to Deputy Olinske's inquiries, provided his name and explained that he lived at Pat Longsworth's property at 6950 CR 19. The officers indicated that

2

they would like to talk to him as part of their investigation. Clark was "in a rush" because he had paperwork to turn in for work by midnight and he believed his failure to meet the deadline meant he would lose wages for the most recent load he had hauled. Either Deputy Olinske or Deputy Waidelich told Clark the talk would take "as long as it takes" and suggested that they go into the house. Because of his paperwork deadline, Clark did not want to go to the house.

Factual disputes abound over whether Clark was handcuffed before or after his *Miranda* rights were read to him. Both Sergeant McCormick and Deputy Olinske aver that they handcuffed Clark first and read him his Miranda warnings after he was cuffed. (McCormick Aff. ¶ 11; ECF No. 32-3; Olinske Aff. ¶ 18; ECF No. 32-1). Clark avers that prior to being handcuffed Sergeant McCormick read him his *Miranda* rights. (Clark Aff. ¶ 9). Clark understood his rights as read to him and asked if he was under arrest. Sergeant McCormick and Deputy Olinske told Clark he was not under arrest and that reading him his rights was a "formality." Clark told Sergeant McCormick he wanted an attorney present and was not going to answer questions. Sergeant McCormick then stepped closer to Clark, raised his voice and "appeared to get very mad, and he told Olinske to put handcuffs on me." (*Id.*).

With respect to the decision to handcuff Clark, both Sergeant McCormick and Deputy Olinske tell the same tale.  They aver that they noticed blue lights coming from the floor of Clark's semi-truck. (McCormick Aff. ¶ 9; Olinske Aff. ¶ 15). They further indicate that based on their training and experience, utilizing blue lights while driving suggested to them that Clark may have been using methamphetamine.[1] The officers then provide the following explanation for why they placed Clark in handcuffs:

---

[1]Plaintiff moves to strike this evidence as well as the officers' assertions that "being on meth makes it very difficult to drive at night, but blue underlights make it easier for the driver to see." (McCormick Aff. ¶ 9; Olinske Aff. ¶ 15). (ECF No. 42). The motion also moves to strike reference to certain 404(b) evidence in ¶ 22 of Olinske's Affidavit. As set forth herein, questions of fact as to the substantive issues preclude

> Between the blue lights, Clark's alleged involvement in the VIN removal and possible stolen trailer, and his aggressive behavior, I ordered Deputy Olinske to place Clark in handcuffs for the safety of the Deputies so we could continue the investigation and maintain security and safety of everyone before an incident became out of control.

(McCormick Aff. ¶ 9). Deputy Olinske averred in nearly identical fashion noting that the same reasons Sergeant McCormick believed handcuffing Clark was warranted also supported his belief that handcuffing was appropriate. (Olinske Aff. ¶ 16).

While he was being handcuffed with his hands behind his back, Clark told the officers that he was a veteran and had a bad right shoulder. Clark claims heavy pressure was used during the handcuffing causing numbness and pain in his right wrist.[2]  Deputy Olinske indicates that Clark stiffened his arms and was uncooperative during the cuffing. However, Deputy Olinske averred that he checked the tightness of the handcuffs by placing his finger between the link and the side of Clark's wrist.

After standing outside in handcuffs for a short time, Clark eventually agreed to answer questions and was taken to the porch of Doris' house. Officer Waidelich stayed with Clark on the

---

summary judgment and the facts that Plaintiff seeks to strike were immaterial to that determination. Accordingly, the Motion to Strike (ECF No. 42) is DENIED as MOOT.

[2] Defendants seek to strike this and other favorable paragraphs from Clark's affidavit under the theory that it's a "sham affidavit." The rule against sham affidavits provides that an affidavit is inadmissible when it contradicts the affiant's previous sworn testimony unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse. *See*, *e.g*., *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015). The rule is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised. *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016). The Seventh Circuit has emphasized that the rule is to be used with "great caution." *Id*. Thus, where the change is plausible or the party offers a suitable explanation for the change, the changes in testimony go to the witness' credibility rather than admissibility. *Id*. The Court has reviewed the paragraphs that the Defendants seek to strike and finds that the paragraphs do not directly contradict any deposition testimony; rather, they expand on answers Clark made during his deposition or offer additional facts that he was not asked about during the deposition. At trial, Defendants are free to question Clark about any discrepancies between his deposition and affidavit. But, for now, they shall remain in the record for summary judgment purposes.  Defendants' Motion to Strike (ECF No. 48) is DENIED.

porch before being taken into the house. Clark asked Waidelich "on more than one occasion" if he could loosen his right handcuff because "I couldn't feel nothing in my hand." (Clark Dep. at 36, ECF No. 32-4). Officer Waidelich did not check, adjust, or loosen the handcuffs.

Eventually, the officers and Clark moved into Doris' house where Clark remained in handcuffs throughout his questioning. Clark again complained about the tightness of the handcuffs to Deputy Olinske. During his questioning, Clark stated that he did not remove the VINs from the trailer Longsworth recently sold. After a little under an hour of being in handcuffs, Clark was released from them and cited for having an expired registration for the semi.[3] He was not formally charged with any offense.

With respect to the search of the semi, these facts, too, are in dispute. The officers contend that Clark consented to the search. Clark says he did not. Regardless, what is clear is that a search of the semi was conducted by Serrgeant McCormick and Deputy Olinske. (McCormick Aff. ¶ 12; Olinske Aff. ¶ 19). Nothing illegal was located in the semi.

## ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific

---

[3] The parties dispute exactly how long Clark was in handcuffs. Defendants contend he was handcuffed at 11:12 pm and remained in handcuffs until 11:55 "at the latest" for a total of 43 minutes (ECF No. 45 at 5). Clark estimates the entire time of the encounter, as a whole, was longer, about an hour and a half. At a minimum, the Court accepts the Defendants' assertion that Clark was in handcuffs at least 43 minutes.

facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v.Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

### B.      Section 1983 Claims

When public officers violate the constitutional rights of citizens, 42 U.S.C. § 1983 provides the vehicle for a legal claim.  Clark claims that his Fourth Amendment rights were violated when he was unlawfully detained, subjected to false imprisonment/arrest and his semi-truck was searched illegally. He also contends that the officers used excessive force by securing him in handcuffs that were too tight.

The Defendant law enforcement officers assert that they are entitled to qualified immunity, which is a doctrine that protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Qualified immunity is intended to strike a balance between "protect[ing] a government

official's ability to function without the threat of distraction and liability" and "afford[ing] members of the public the ability to vindicate constitutional violations by government officials who abuse their offices." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (internal quotation marks and citations omitted).

Because Defendants have raised the defense of qualified immunity, it is the Plaintiff's burden to defeat it. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017); *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). Plaintiff satisfies this burden if he shows (1) that the facts, taken in the light most favorable to the Plaintiff, make out a violation of a constitutional right, and (2) that constitutional right was clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that his conduct was unlawful. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Williams v. City of Chi.*, 733 F.3d 749, 758 (7th Cir. 2013) (citation omitted). "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs*, 755 F.3d at 537. The Court is not required to address the prongs in order. *Pearson*, 555 U.S. at 236.

**1**.     **Fourth Amendment—Seizure**

Defendants characterize their actions through the grid of reasonable suspicion. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). Under *Terry*, police officers are justified in conducting a brief investigatory stop if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. "A *Terry* investigative stop 'gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity.'" *United States v. Bullock*, 632 F.3d 1004, 1014–15 (7th Cir. 2011) (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995)). Although reasonable suspicion requires more than a mere "hunch," it is a

measure of suspicion less demanding than that required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). It is a "commonsense, nontechnical" concept dealing with "the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (internal quotations marks omitted).

In evaluating the reasonableness of an investigatory stop, courts examine whether the "officer's action was justified at its inception" and "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) (quoting *Terry*, 392 U.S. at 20). No bright lines exist on how long an investigatory detention can last, or what measures of force may be used throughout, before the restraint on freedom will be considered a formal arrest that must be accompanied by probable cause. *See Rabin v. Flynn*, 725 F.3d 628, 63233 (7th Cir. 2013); *see also Bullock*, 632 F.3d at 1016 ("Given the endless variations in the facts and circumstances, there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest.") (internal quotation marks and citation omitted).) Mindful of these guidelines, the Court examines the encounter between Clark and the Defendant officers.

At the time Clark arrived at the property, the officers were executing a search warrant as part of an investigation into the stolen trailer. While there they discovered the defaced VIN and Clark became known to them (if he had not already been previously known to them) in the investigation. There is no argument from Clark, and could not be, that the officers were not entitled to ask Clark to identify himself and his reason for being on the property. *See Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 185–86, (2004) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth

Amendment seizure")(quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)). Once Clark identified himself, however, there is little question but that officers had reasonable suspicion to detain him. Doris' implication of Clark in the VIN investigation provided a minimal level of objective justification for detaining Clark and allowing them to determine whether Clark had engaged in a criminal act.[4] Therefore, under *Terry,* the Defendant officers were permitted to temporarily detain Clark while they investigated his involvement in the VIN removal.

The true issue Clark presents, however, is whether the manner in which the officers effectuated the detention was reasonably related in scope to the circumstances which initially justified the interference. *Terry,* 392 U.S. at 20. Or, whether, by the officers' acts of forcibly handcuffing him and keeping him in handcuffs for the better part of an hour while they questioned him, Clark's temporary detention morphed into a full-blown arrest, *de facto* or not, requiring probable cause. "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). Moreover, "[a] seizure that is justified ... can become unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Id.*

There can be no dispute that the use of handcuffs increases the severity of a seizure, or that a longer detention is more intrusive than a shorter one. Indeed, "'[s]ubtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a *de facto* arrest.'" *Bullock*, 632 F.3d at 1016 (quoting  *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir. 1994)). "Police restraint may become so intrusive that, while not technically an 'arrest,' it becomes

---

[4]Clark asserts that the information obtained by the officers from Doris was far too speculative and unreliable to give rise to reasonable suspicion. The Court disagrees. "A neighbor's report of suspicions, even if speculative, is relevant to an investigation and a determination of reasonable suspicion or probable cause." *Daubach v. Wnek*, No. 00 C 0459, 2001 WL 290181, at *4 (N.D. Ill. Mar. 16, 2001).

'tantamount' to an arrest requiring probable cause." *Id.* (citing *Dunaway v. New York,* 442 U.S. 200, 212–16 (1979)).

Clark asserts that by placing him in handcuffs and reading him his *Miranda* rights, the investigatory stop was no longer brief or nonintrusive, as authorized by *Terry,* but had ripened into an arrest requiring probable cause. *See Matz v. Klotka*, 769 F.3d 517, 524–25 (7th Cir. 2014); *Abbott v. Sangamon County*, 705 F.3d 706, 719–20 (7th Cir. 2013). The Seventh Circuit has, on a variety of occasions, found that using handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances. *See, e.g., Bullock*, 632 F.3d at 1016 (finding it reasonable to place Bullock in handcuffs and in the squad car for officer safety while the officers pursued their drug  investigation); *United States v. Shoals,* 478 F.3d 850, 853 (7th Cir.2007) (stating that police officers do not convert *Terry* stop into full custodial arrest by drawing their weapons or handcuffing the subject, particularly where the situation is inherently dangerous); *United States v. Chaidez,* 919 F.2d 1193, 1198-99 (7th Cir.1991) (detention did not turn into arrest even though agents drew guns, took car keys, gave *Miranda* warnings, took one defendant to police van to sign consent-to-search form, and detained defendants for ten to fifteen minutes during search of house; the intrusion was less than that involved in an arrest); *see also*, *Ramos v. City of Chicago,* 716 F.3d 1013, 1018 (7th Cir.2013) ("The proliferation of cases in this court in which *'Terry'* stops involve handcuffs and ever-increasing wait times in police vehicles is disturbing, and we would caution law enforcement officers that the acceptability of handcuffs in some cases does not signal that the restraint is not a significant consideration in determining the nature of the stop."). In all these cases, the decisive question is whether the officer's actions were reasonable under the

circumstances and whether the surrounding circumstances gave rise to a justifiable fear for personal safety on the part of the officer. *Jewett,* 521 F.3d at 824.

This question is front and center here. Beginning first with the nature of the investigation itself. The Defendants were investigating a stolen trailer and the removal of the VINs. On its face, there is nothing inherently dangerous about this type of investigation, and the Defendants do not claim otherwise. Moreover, it appears that at the time Clark arrived, the main subject of the investigation had already been arrested without incident and transported from the property. The Defendants were moving about the property, interviewing witnesses, and taking statements. This simply was not a case where the police were involved in a swiftly developing situation, nor do the Defendants argue that they feared the investigation was rapidly evolving into something violent. *United States v. Sharpe,* 470 U.S. 675, 686 (1985) (noting that where police encounters are rapidly developing and could turn violent, "the court should not indulge in unrealistic second-guessing.").

Against that backdrop, the officers contend that they placed Clark in handcuffs (for officer safety) based on three reasons: (1) he was a suspect in the VIN removal; (2) when he arrived at the property he acted aggressively and yelled at officers;  and (3) they saw blue lights on the floor of his semi-truck and their experience advised them that meth users often use blue lights while driving. True, if the facts bore out as Defendants assert and Clark was threatening their personal safety, handcuffing Clark for officer safety may be reasonable as a matter of law. However, at least some of the facts giving rise to the handcuffing are disputed and shed light on the ultimate issue of the reasonableness of the officers' conduct.

 For instance, Clark claims he was not aggressive towards the officers at all; rather, he contends the opposite, the officers were aggressive towards him. When he arrived at the property, the officers shined a flashlight in his face, demanded to know why he was there and, once he

identified himself, they *Mirandized* him. Upon his assertion of his right to remain silent and his inquiry as to whether he was under arrest, he contends the officers aggressively placed him in handcuffs causing him pain and detained him for the better part of an hour. Because a reasonable jury could credit Clark's side of the dispute and conclude that the officers' conduct was unreasonable and amounted to an unlawful *de facto* arrest, summary judgment must be denied. *Bowden v. Town of Speedway, Ind.,* 539 F.Supp.2d 1092, 1101 (S.D. Ind. 2008) (concluding the handcuffing of an unarmed, non-violent person violated the Fourth Amendment because it exceeded the bounds of *Terry*).

These factual disputes likewise preclude summary judgment on qualified immunity. *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) ("When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial."); *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) (factual disputes concerning the degree to which suspect became agitated and threatening in speaking to officer and whether suspect made physical contact with officer prevented summary judgment on qualified immunity grounds). If the jury credits Clark's version of the events, it would mean that the officers handcuffed Clark without establishing a sufficient threat to officer safety and subjected him to an unlawful arrest without probable cause. *El–Ghazzawy v. Berthiaume,* 636 F.3d 452, 459–60 (8th Cir.2011) (denying qualified immunity for the use of handcuffs during a *Terry* stop). As for whether the rights here are clearly established, the notion that they were is properly encapsulated in *Bennett v. City of Eastpointe*, 410 F.3d 810, 841 (6th Cir. 2005), albeit in terms of whether pat-down was warranted[5]:

---

[5] Although *Bennett* speaks in terms of pat-down searches, the Court notes the same rationale applies to restraining a person during an investigatory stop. Oddly, in this case, although the officers claim that they handcuffed Clark for officer safety, there is no evidence presented from Clark or the Defendants that he was ever patted down or searched for weapons. Similarly, the Defendants, while relying on officer safety, also do not aver that they believed Clark had a weapon or that he threatened the officers.

> Counsel may shout "officer safety" until blue-in-the-face, but the Fourth Amendment does not tolerate, nor has the Supreme Court or this Court ever condoned, pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that the person detained was armed and dangerous. The Supreme Court has, in interpreting the Fourth Amendment, struck a balance between the justifiable concern for officer safety when confronting an individual and the substantial individual interest in being free from unreasonable intrusion. The Framers' concerns and clear intent to protect individuals from arbitrary government intrusion was enshrined in the Fourth Amendment to prevent situations such as those alleged here—officers, having no reason to fear for their safety, may not require citizens, whom they have not arrested, to stand up against gates or place their hands on police cars, and submit to searches. This has long been the law.

This same rationale applies to the right to be free from arrest not supported by probable cause as this right "has been clearly established for a long time." *Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009). Clark's handcuffing and subsequent detention, at least as Clark alleges it took place, does not warrant qualified immunity, as it would be unreasonable under the Fourth Amendment, and would be an objectively unreasonable Fourth Amendment violation by Defendants. The Defendants' Motion for Summary Judgment on this claim is DENIED.

   2.   **Excessive Force**

The Court now turns to Clark's claim that he was handcuffed in a manner that constitutes the unreasonable use of force. Whether the use of force is objectively reasonable under the Fourth Amendment depends on the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The circumstances include the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting or evading arrest. *Id.* at 396. The Seventh Circuit "has on occasion recognized valid excessive force claims based on overly tight handcuffs." *Tibbs v. City of Chicago,* 469 F.3d 661, 666 (7th Cir. 2006). Under the Fourth Amendment, an officer may not knowingly use handcuffs in a manner that will inflict unnecessary pain or injury on a person who presents little or no flight risk or threat

of harm. *Stainback v. Dixon*, 569 F.3d 767 (7th Cir. 2009) (citing *Herzog v. Village of Winnetka, Illinois*, 309 F.3d 1041, 1043 (7th Cir. 2002)).

The Defendants assertions here are similar to their earlier arguments relating to unlawful seizure; they contend they did not subject Clark to excessive force and, even if they did, they are entitled to qualified immunity. The facts upon which the Defendants base their arguments, however, are disputed. Defendants' version is that Clark pulled away and resisted being handcuffed, Deputy Olinske checked the tightness of the handcuffs at the time he handcuffed Clark, Clark never advised them of his shoulder injury, and Clark only asked one time for the handcuffs to be loosened. Additionally, they observe that Clark did not require or seek medical treatment after the encounter based on the restrictive handcuffing. These facts, Defendants assert, warrant a conclusion that they did not engage in excessive force and qualified immunity further protects them. *See e.g.*, *Sow v. Fortville Police Dep't*, 636 F.3d 293, 304 (7th Cir. 2011) (affirming grant of summary judgment to defendant police officer on excessive force claim based on overly tight handcuffs where plaintiff complained once but presented no evidence that he elaborated on the pain to the defendant or required any medical treatment); *Stainback*, 569 F.3d at 773 & n.7 (affirming grant of summary judgment to defendant police officers on excessive force claim based on overly tight handcuffs where, at most, the record showed that plaintiff "said that he did not want to be handcuffed because he thought it would hurt" and "complained generally about pain after he was handcuffed ... without any elaboration regarding a preexisting injury or other infirmity," even though plaintiff suffered two torn rotator cuffs that required medical treatment).

Clark's version is quite different and, at this stage, the Court must credit his reasonable and plausible facts. He argues that he did not resist Deputy Olinske during handcuffing, he told the officers of his pre-existing shoulder injury, complained multiple times to different officers about

the overly tight handcuffs, and the officers ignored his complaints about numbness and tingling in his wrists. The officers' conduct here, if Clark's assertions are believed, places the officers' conduct somewhere on the foggy margin separating excessive force from appropriate force.

Indeed, "[w]ith respect to the application of handcuffs too tightly, courts have found no viable excessive force claim where the plaintiff complained only twice following his arrest about the cuffs being too tight, his wrists were red for one and one-half days, and he received no medical care for his wrists." *Verser v. Hubbard*, No. 10 C 7513, 2011 WL 2173754, at *2 (N.D. Ill. June 1, 2011). Likewise, in *Stainback* the Court found the officers' use of handcuffs reasonable because the officers "did not use handcuffs in a manner that would clearly injure or harm a typical arrestee," because "it was not objectively clear to the [o]fficers that [the plaintiff] suffered from any infirmities," and because the plaintiff did not "inform the [o]fficers that he had a preexisting injury or condition that would be aggravated if he were handcuffed." 569 F.3d at 773. But, in *Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003), the Seventh Circuit held that an officer was not entitled to qualified immunity for applying tight handcuffs that caused numbness and pain where the plaintiff "posed no danger" to the officer, "did not resist arrest," and "was alleged to have committed a very minor, non-violent crime."

The present case is a borderline case and, while admittedly thin, must survive summary judgment. Whether the officers' conduct was reasonable is dependent on credibility determinations and the facts as developed through trial. For instance, here, unlike in *Stainback*, a jury might conclude that the Defendants' knowledge of the Plaintiff's shoulder injury along with his repeated requests to loosen the handcuffs and complaints of numbness in his wrists was sufficient to demonstrate an intention to use the handcuffs in a manner the officers knew would injure Clark. *Stainback*, 569 F.3d at 773.

Defendants maintain, however, that the fact that Clark failed to seek medical treatment demonstrates that no excessive force was applied. The Court agrees that Clark's failure to seek medical treatment may very well sound the death knell for this claim at trial. However, Clark avers that he had ongoing numbness and tingling in his wrist "for many months" as a result of this encounter and he still has numbness in his right hand, but admitted that he did not have these issues medically evaluated.[6]  It is up to the jury to decide whether his explanation for not obtaining medical treatment is sufficient, not this Court.

This said, whether the officers can be said to violate clearly established law with respect to the handcuffing is also not amenable to summary judgment for the same reasons as above. Crediting Clark's facts and melding those facts with Seventh Circuit case law, a reasonable official in the defendants' shoes would have understood that to forcibly handcuff a compliant individual with a pre-existing shoulder injury, ignore repeated complaints of pain and numbness caused by the tightness of the handcuffs, and detaining him for 43 minutes in those handcuffs violates the right to be free of excessive force. *Stainback,* 569 F.3d at 773; *Payne,* 337 F.3d at 780. Defendants' Motion for Summary Judgment is, therefore, DENIED.

### 3.    Search of the Vehicle

Defendants also move for summary judgment on Clark's claim that his vehicle was unlawfully searched. Defendants' motion for summary judgment is, in effect, a single sentence which reads, "Plaintiff's claim fails because he consented to the search of his vehicle." (ECF No. 33 at 13). Clark's response is equally enlightening, "Clark never consented to, and the Defendants had no probable cause to search his vehicle, nor a warrant authorizing such a search." (ECF No.

---

[6] During his deposition, Clark acknowledged that he did not get "checked out" and stated that he goes to the VA Hospital and didn't want to "waste their time with this sort of" thing. (Clark Dep. at 49).

41 at 26). Defendants' reply does not address the claim at all.  Because there exist disputed issues of fact, summary judgment is DENIED.

### 4.        Retaliation based on First and Fifth Amendments

Clark also asserts claims of retaliation under the First and Fifth Amendments.[7] He asserts that the officers retaliated against him by handcuffing him once he asserted his constitutional right to remain silent.

To establish a retaliation claim for exercising a constitutional right, a plaintiff must show: "(1) he engaged in protected conduct; (2) the defendant took an adverse action against him 'that would deter a person of ordinary firmness from continuing to engage in that conduct'; and (3) that the adverse action was taken (at least in part) because of the protected conduct." *Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)); *see also*, *Gomez v. Randle*, 680 F.3d 859, 866-67 (7th Cir. 2012) and *Neal v. Richardson*, No. 16-CV-627-WMC, 2019 WL 4393074, at *2 (W.D. Wis. Sept. 13, 2019). A plaintiff engages in protected conduct for purposes of a retaliation claim "when he exercise[s] both his First Amendment right not to speak in response to defendant['s]…questions and his Fifth Amendment right against self-incrimination." *Bridges v. Hubbard*, No. CIV S-09-0940 TLN, 2013 WL 3773886, at *9 (E.D. Cal. July 17, 2013), report and recommendation adopted, No. 2:09-CV-0940 TLN DAD, 2013 WL 5230239 (E.D. Cal. Sept. 16, 2013). Once a plaintiff raises an inference that the defendant's conduct was motivated in part by the plaintiff's protected activity, the burden shifts to the defendant to demonstrate that he would have taken the same action in the

---

[7] Clark's claim is based on the First Amendment right to be protected from government compulsion to speak, *Masterpiece Cakeshop, Ltd. V. Colorado Civil Rights Comm'n*, 138 S.Ct. 1719, 1745 (2018), and his Fifth Amendment right to refuse to answer questions that may later be used against him in a criminal prosecution. *Lefkowitz v. Turley*, 414 U.S. 70, 78 (1973).

absence of the protected activity. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 371 (6th Cir. 2011).

Here, even assuming that Clark engaged in protected activity and suffered a retaliatory action by the Defendants, the record is sparse with respect to the officers' motivations.  The only favorable evidence Clark points to in an effort to raise an inference of the officers' improper motivation is Clark's belief that Sergeant McCormick was "angered" by his refusal to answer questions. Sergeant McCormick may very well have been frustrated or angered by Clark's refusal, but Clark has raised no inference independent of his own interpretation of Sergeant McCormick's conduct suggesting that it was his protected activity that motivated his handcuffing. Based on this tenuous evidence, the Court concludes no reasonable jury could find that the officers engaged in retaliation. Defendants' Motion for Summary Judgment is GRANTED as to Clark's claims of retaliation.

### C.      State Law Claim

In addition to his §1983 claims, Clark asserts a claim under the Indiana Tort Claims Act (ITCA), Ind. Code §34-13-3-1, *et seq.* against the Sheriff.  In essence, Clark asserts that the individual officers/employees, while acting within the scope of their employment, violated Indiana state law during the course of their interaction with Clark (through false arrest, false imprisonment, battery and unlawful detention) and that these violations are imputable to the Sheriff under Indiana law.  Defendants have moved for summary judgment asserting immunity under the ITCA.

Under the ITCA, "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Ind. Code § 34–13–3–5(b). The purpose of the ITCA is to "ensure that public employees can exercise their independent judgment necessary to carry out their duties without threat of harassment by

litigation or threats of litigation over decisions made within the scope of their employment." *Bushong v. Williamson,* 790 N.E.2d 467, 472 (Ind. 2003) (citations omitted). Defendants are correct that the ITCA also contains a law enforcement immunity provision that shields state actors, acting within the scope of their employment, who are engaged in the "adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment." I.C. § 34–13–3–3(8). Thus, in the absence of any argument in the briefing to the contrary, Plaintiff's claims for false arrest and false imprisonment under state law are not subject to immunity. Indiana courts have likewise found excessive force claims to fall outside the scope of law enforcement immunity. *Wilson v. Isaacs,* 929 N.E.2d 200, 203–04 (Ind. 2010) (concluding that the law enforcement immunity of the ITCA does not shield the government from liability for excessive force by police); *see also*, *Susanowitz v. Town of Hamilton,* No. 1:10-CV-26, 2011 WL 65777, at *8 (N.D. Ind. Jan. 10, 2011). Consequently, the statutory law enforcement immunity does not shield the Sheriff from liability for these claims.

Nevertheless, Defendants assert that even if the Sheriff is not immune for the above conduct, it shields the Sheriff from liability for any claim that the Defendant officers intentionally inflicted emotional distress on Clark. To this end, they cite the Indiana Court of Appeals opinion in *City of Anderson v. Weatherford,* 714 N.E.2d 181, 185-186 (Ind. Ct. App. 1999) for the proposition that immunity applies in cases where a plaintiff alleges intentional infliction of emotional distress occasioned by an egregious arrest. Fortunately, the Court need not travel down this road as the undisputed facts here simply fail to establish the existence of an IIED claim regardless of immunity.

Intentional infliction of emotional distress occurs when "'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another....'" *Cullison v. Medley,* 570 N.E.2d 27, 31 (Ind. 1991) (quoting Restatement (Second) of Torts § 46 (1965)). The *Cullison* court explained that: "It is the intent to harm one emotionally that constitutes the basis for the tort of an intentional infliction of emotional distress." *Id.* Moreover, under Indiana law, conduct is extreme and outrageous:

> only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Conwell v. Beatty,* 667 N.E.2d 768, 777 (Ind. Ct. App.1996) (quoting Restatement (Second) of Torts § 46 (1965), *reh'g denied*).

Here, even if Clark's version of the events is credited, the conduct of the Defendant officers is far from the spectrum of outrageousness which is required under Indiana law to support an IIED claim. Moreover, as Defendants aptly point out, Clark has not alleged any emotional distress at all, and certainly no emotional distress "of a very serious kind" which is what the law requires. *Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 550 (Ind. Ct. App. 2015)(quoting *Curry v. Whitaker,* 943 N.E.2d 354, 361 (Ind. Ct. App. 2011)) ("IIED is found where conduct exceeds all bounds typically tolerated by a decent society and causes mental distress of a very serious kind."). Because Clark has not raised genuine issues of material fact to support this claim, the Defendant's Motion for Summary Judgment on this claim is GRANTED.

## **CONCLUSION**

Based on the foregoing, the Defendants' Motion for Summary Judgment (ECF No. 32) is GRANTED in part, and DENIED in part, consistent with this Opinion and Order. **The Motions to Strike (ECF Nos. 42 and 48) are DENIED.**

SO ORDERED on November 3, 2020.

 s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT